**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**


**INSTITUTE FOR CREATION FOR RESEARCH
GRADUATE SCHOOL,**

                          **Plaintiff,**


**-vs-**                                                    **Case No.  A-09-CA-382-SS**

**T E X A S   H I G H E R   E D U C A T I O N
COORDINATING BOARD, COMMISSIONER
RAYMUND PAREDES, LYN BRACEWELL
PHILLIPS, JOE B. HINTON, ELAINE
MENDOZA, LAURIE BRICKER, A.W. "WHIT"
RITER, III, BRENDA PEJOBICH, and ROBERT
SHEPARD,**

                          **Defendants.**
_____


**O R D E R**


        BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause,

specifically Plaintiff the Institute for Creation Research Graduate School ("ICRGS")'s Motion to Strike

[#34]; ICRGS's Unopposed Motion for Scheduling Relief [#51]; ICRGS's Final Motion for Summary

Judgment [#53], Defendants the Texas Higher Education Coordinating Board (the "Board"),

Commissioner Raymund Paredes, Lyn Bracewell Phillips, Joe Hinton, Elaine Mendoza, Laurie

Bricker, A.W. Riter, III, Brenda Pejobich, and Robert Shepard (collectively, "Defendants")'s response

thereto [#60], and ICRGS's reply [#61]; and Defendants' Motion for Summary Judgment [#54], and

ICRGS's response thereto [#59].  Having considered the aforementioned documents, the case file as

a whole, and the relevant law, the Court enters the following opinion and orders.

## Background

Plaintiff the Institute for Creation Research Graduate School ("ICRGS") seeks to offer a Master of Science degree with a major in Science Education from "a Biblical scientific creationist viewpoint" in Texas.[1]   Sec. Am. Compl. [#26] at ¶ 4; Def.'s Mot. Summ. J. [#54], Ex. 1.   Defendant the Texas Higher Education Coordinating Board ("the Board") turned down ICRGS's application for a "certificate of authority" to offer the degree on April 24, 2008.   *Id.* at ¶ 9.   ICRGS claims the Board "effectively treated ICRGS's M.S. curriculum as a ***non***-science education curriculum, due to ICRGS's openly creationist viewpoint."   *Id.* at ¶ 28 (emphasis in original).   The basic facts leading up to the denial are set forth below.   The facts are undisputed unless otherwise indicated.

## I.  ICRGS's Application for a Certificate of Authority

In July 2007, ICRGS applied to the Board for a certificate of authority to offer a Master of Science degree with a major in Science Education in Texas.[2]   *See* Def.'s Mot. Summ. J., Ex. 1 (Pl.'s application).   The application states ICRGS was established "for three main purposes, all involving the study and promotion of scientific creationism, Biblical creationism, and related fields[.]"   *Id.* ICRGS included with its application extensive documentation on the proposed Master of Science degree in order to show the program satisfied the Board's "standards of operation" which, according

---

[1]ICRGS has offered the degree for many years in California, where it originated.

[2]The Texas Education Code requires a private post-secondary educational institution may not grant or award a degree or offer to grant or award a degree "unless the institution has been issued a certificate of authority to grant the degree by the board in accordance with the provisions of this subchapter."   TEX. EDUC. CODE § 61.304(a); *and see* 19 TEX. ADMIN. CODE § 7.8(3)(A).   To obtain a certificate of authority, an institution must satisfy the Board that it meets standards the Board has adopted.   TEX. EDUC. CODE § 61.306(a).

to the Board, represent "generally accepted administrative and academic practices and principles of accredited post-secondary institutions in Texas." 19 TEX. ADMIN. CODE § 7.4.[3]

## II.    Review and Site Visit

The Board's staff reviewed the application, and requested an on-site evaluation of ICRGS by a "site review team," in accordance with the Board's normal procedures. *See* 19 TEX. ADMIN. CODE § 7.8(3)(F).[4] Generally, a site review team is designated by the Commissioner of the Board, and must be composed of at least three individuals, "all of whom have experience and knowledge in postsecondary education." *Id.* § 7.8(3)(G). The site review team generally conducts an on-site review of the institution and prepares a report on the institution's ability to meet the Board's standards of operation, detailed in Rule 7.4. *Id.* § 7.8(3)(I). The institution then has thirty days in which to respond to the site review team's report; once it has done so, the Certification Advisory Council (the "CAC") will review both the site visit report and the institution's response and make a staff recommendation to the Commissioner. *Id.* § 7.8(3)(J)-(K). Upon receipt of the CAC's recommendation, the Commissioner will make his recommendation regarding the application to the Board, and the Board will either approve or deny the application. *Id.* § 7.8(3)(L)-(N).

In this case, the site team was initially composed of four members, only one of whom had a science or science education background. Def.'s Mot. Summ. J., Ex. 6. That member, Dr. Loving,

---

[3]Rule 7.4 sets forth specific standards for all institutions operating in the state of Texas in the following 24 areas: legal compliance, qualifications of institutional officers, governance, distinction of roles, financial resources and stability, financial records, institutional assessment, institutional evaluation, administrative resources, student admission and remediation, faculty qualifications, faculty size, academic freedom and faculty security, curriculum, general education, credit, learning resources, facilities, academic records, accurate and fair representations in advertising and promotion, academic advising and counseling, student rights and responsibilities, health and safety, and learning outcomes. *See* 19 TEX. ADMIN. CODE § 7.4.

[4]Chapter 7 of the Texas Administrative Code has been amended and reorganized during the course of this litigation. The relevant rules binding the Board have remained unchanged and in effect, although in some cases they have been renumbered. The Court refers to them, unless otherwise indicated, in their current form.

had to cancel her participation in the site visit for personal reasons; therefore, the site team was ultimately composed of only three members, none of whom (according to the Defendants) had a science education background.[5]  *Id.*  The team produced a report in November 2007, in which it examined each of the standards set forth in Rule 7.4.  With respect to the curriculum, the report concluded the "proposed master's degree in science education, while carrying an embedded component of creationist perspectives/views, is nevertheless a plausible program[,]" and would be "generally comparable to an initial master's degree in science education from one of the smaller, regional universities in the state."  Def.'s Mot. Summ. J., Ex. 2.  Although the report identified deficiencies in some of the other standards (specifically, in the areas of Governing Board, Distinction of Roles, Institutional Assessment, and Library), these concerns were later addressed by ICRGS, as noted in its initial response to the report.  *See* Pl.'s Mot. Summ. J. at ¶ 4.

Based on the report and ICRGS's response, the CAC recommended conditional approval of ICRGS's proposed program at its December 14, 2007 meeting.  *Id.* at ¶ 12.  However, the Commissioner of Higher Education, Raymund Paredes ("Commissioner Paredes"), allegedly observed flaws in the site visit team's report, and accordingly recommended to the Board that a group of scientists and science educators re-evaluate ICRGS's proposed degree program.  *See* Pl.'s Mot. Summ. J. at SOAH 477 (Comm.'s Rec. of Apr. 23, 2008).  As Commissioner Paredes later wrote, "It seemed clear to me upon reading the various evaluation documents that the central issue of whether the proposed program met appropriate standards of science education had been insufficiently addressed. As a result, I directed staff to conduct a fresh review."  *Id.*

---

[5]The other members of this site visit team were Dr. Lee Waller, Ph.D., Assistant Professor in the Department of Educational Leadership, Texas A&M; Dr. Gloria White, Ed.D., Managing Director of the Dana Research Center for Mathematics and Science Education, University of Texas at Austin; and David Rankin, Social Science/Reference Documents Librarian at Texas A&M.  ICRGS claims Dr. White also had a science education background, although it presents no evidence on this point.

## II.    The Review Panel's Review and Report

Accordingly, various individuals who taught science education in Texas post-secondary institutions, were trained as teachers in the field, and had credentials as experts in science or science education were assembled to re-evaluate the curriculum of ICRGS's proposed program in January 2008. Def.'s Mot. Summ. J., Ex. 13 (Paredes Depo.) at 21-22. The assembled review panel examined ICRGS's application, the mission statement of ICRGS, the Board's standards, the proposed program's admission standards and course requisites, the syllabi and textbook lists for its proposed courses, and compared ICRGS's curriculum with science curricula from other universities. *See, e.g.,* Def.'s Mot. Summ. J., Ex. 10 (Patterson Decl.) at ¶ 10.

After undertaking their review, the panel expressed a wide variety of concerns about the curriculum (which are discussed in detail, *infra*). Commissioner Paredes and Board staff met with representatives of ICRGS to inform them of the questions raised. After the meeting, ICRGS asked for and was granted a postponement of the scheduled review of its application by the Board, so that it might more fully respond to the concerns. ICRGS submitted revised materials to the Board, which the panel duly reviewed.[6]

The panel ultimately recommended ICRGS's application for a certificate of authority be rejected. Essentially, the panel reasoned much of the course content was outside the realm of science and lacked potential to help students understand the nature of science and the history and nature of the

---

[6]As far as the Court can tell, the review panel initially had nine members. However, only four of the nine members re-reviewed the curriculum of ICRGS's proposed program after ICRGS supplemented its application to respond to the panel's requests. It is this second review panel which is relevant, as this panel studied all of the available material submitted by ICRGS, not just its initial application. This panel was composed of the following members: Dr. Gerald Skoog, Co-Director for the Center for Science Education and Research at Texas Tech University; Dr. Barbara Curry, Science and Mathematics Education at the University of Texas at Dallas; Dr. David Hillis, a professor in Natural Sciences at the University of Texas at Austin; and Dr. C.O. Patterson, a biology professor at Texas A&M University. Def.'s Mot. Summ. J., Ex. 6.

natural world.  *See*  Def.'s Mot. Summ. J., Ex. 12 (Skoog Aff.).  One of the reviewers, Dr. Gerald Skoog, put his conclusions in a report.  *See* Skoog Aff., Ex. 2.

## IV.    Staff Recommendation to Commissioner Paredes

Based upon Dr. Skoog's report and the recommendations of the other panel members, Dr. Joseph Stafford (the Board's Assistant Commissioner for Academic Affairs and Research), wrote a memorandum to Commissioner Paredes on behalf of the Board staff, recommending ICRGS's application for a certificate of authority be rejected.  Def.'s Mot. Summ. J., Ex. 6 (Stafford Rep.).  He noted the original site visit team had not included a "science education expert," and that the team had reviewed ICRGS's proposed curriculum "based on general knowledge of course catalog descriptions, but not specifically from the perspective of a science educator."  *Id.*  He stated this was a "deficiency" in the initial review process, which had necessitated the review panel of scientists and science educators.  *Id.*

Dr. Stafford concluded all the Board's standards had been met by ICRGS's proposed program except for "those standards directly related to the curriculum and its presentation to the public," *i.e.* "Standard 12."[7]  *Id.*  Dr. Stafford found the degree designation of science was inappropriate for the program, as was the designation of the major course of study as science education.  *Id.*  He concluded the Board's standard for curriculum was not met by ICRGS's proposed program, and recommended the certificate of authority not be granted.  *Id.*

---

[7]In the revised rules, Standard 12—the standard for curriculum—is now Standard 14 (or § 7.4(14)).  *See* 19 TEX. ADMIN. CODE § 7.4(14).  However, the Court will refer to it as "Standard 12" because it is so named in all the documents relating to this case.

V.     **Commissioner's Recommendation and the Board's Decision**

On April 23, 2008, Commissioner Paredes recommended ICRGS's application for a certificate of authority should not be approved by the Board.   Def.'s Mot. Summ. J., Ex. 7 (Comm.'s Rec. of Apr. 23, 2008).   As justification for having a separate panel re-evaluate the proposed program, he stated that upon reading the initial site visit team's evaluation "[i]t was immediately clear to me that the review process had been flawed"—first, because the site visit team had "included no experts in science education," and secondly, because "the site visit team members were instructed to focus on questions of process and infrastructure and to disregard the academic focus of the proposed program[,]" and the CAC had followed a "similar tack" in its review.[8]  *Id.*  Commissioner Paredes wrote it was clear to him upon reading the site visit team and the CAC's reports that "the central issue of whether the proposed program met appropriate standards of science education had been insufficiently addressed." *Id.*  Therefore, Commissioner Paredes had directed staff to conduct a "fresh review."

Commissioner Paredes, after assessing the results of the "fresh review," concluded it had been "thorough and balanced."  He joined the review panel in recommending the Board deny ICRGS's application for two major reasons: first, he found the proposed program's curriculum was inconsistent with the standards or conventions of science and science education, and secondly, he found the

---

[8]It should be noted ICRGS strongly disagrees the initial site visit team was asked to disregard the academic focus of the degree program and adamantly denies other members of the initial site team did not have science education experience (although it presents no evidence on this point).  It refers to Commissioner Paredes's statements on these points a "revisionist mischaracterization" of the site team's actual evaluation.  Pl.'s Mot. Summ. J. at 6-9.  Commissioner Paredes does not indicate who, if anyone, instructed the site visit team to disregard the academic focus of the degree program.  But because ICRGS does not dispute the Board has authority to re-evaluate a proposed program or to review a certain aspect of the program more thoroughly during the time the evaluation is pending, the Court finds no basis to dwell on the justification for the re-evaluation, which is unimportant.

program's curriculum was inconsistent with the Board's standards, and specifically with Standard 12, relating to curriculum.

After receiving the Commissioner's recommendation, but before making its decision, the Board heard from ICRGS and from representatives of the general public. On April 24, 2008, the Board denied ICRGS's application for a certificate of authority.

## VI.    The present action

Based on the Board's denial, ICRGS brought this lawsuit (which was removed to this Court in May 2009) against the members of the Board—Commissioner Paredes, Lyn Phillips, Joe Hinton, Elaine Mendoza, Laurie Bricker, Whit Riter, Brenda Pejobich, and Robert Shepard (collectively, the "Board Member Defendants")—under 42 U.S.C. § 1983 for infringement of its 1st and 14th Amendment rights to free speech, free exercise, equal protection, and due process, and against the Board Members and the Board itself under the Texas Constitution, the Texas Religious Freedom Restoration Act ("TRFRA"), and Chapter 106 of the Texas Civil Practices and Remedies Code (which prohibits discrimination). *See* Sec. Am. Compl. at ¶¶ 40-41. ICRGS sues for declaratory and injunctive relief only.

Both parties have filed motions for summary judgment and responses in opposition to the opposing party's motion. Because the motions deal with essentially the same issues, the Court will discuss them together.

### Analysis

## I.    Summary Judgment Standard

Summary judgment may be granted if the moving party shows there is no genuine issue of material fact, and it is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). In deciding summary judgment, the Court construes all facts and inferences in the light most favorable to the

nonmoving party. *Richter v. Merchs. Fast Motor Lines, Inc.*, 83 F.3d 96, 98 (5th Cir. 1996). The standard for determining whether to grant summary judgment "is not merely whether there is a sufficient factual dispute to permit the case to go forward, but whether a rational trier of fact could find for the nonmoving party based upon the record evidence before the court." *James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990).

Both parties bear burdens of production in the summary judgment process. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The moving party has the initial burden of showing there is no genuine issue of any material fact and judgment should be entered as a matter of law. FED. R. CIV. P. 56(c); *Celotex*, 477 U.S. at 322–23; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The nonmoving party must then come forward with competent evidentiary materials establishing a genuine fact issue for trial, and may not rest upon mere allegations or denials of its pleadings. *Anderson*, 477 U.S. at 256–57; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). Neither "conclusory allegations" nor "unsubstantiated assertions" will satisfy the non-movant's burden. *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996).

## II.    Texas Education Code § 1.001(a)

ICRGS's primary argument is that the plain language of the Texas Education Code limits the Code's applicability (and thus the Board's authority) solely to government-funded institutions. Pl.'s Mot. Summ. J. at 2-3. It is undisputed ICRGS has never received government funding, and thus ICRGS seeks summary judgment the Board has no jurisdictional or regulatory authority over ICRGS under the Texas Education Code. *Id.* Defendants disagree with this interpretation of the Education Code's provisions. Def.'s Resp. at 3-6.

ICRGS's argument rests entirely on § 1.001(a) of the Education Code, which provides: "This code applies to all educational institutions supported in whole or in part by state tax funds unless

specifically excluded by this code." But Defendants argue § 1.001 simply indicates all educational institutions supported by state tax funds ***are*** subject to the Education Code, but does not expressly indicate all other educational institutions are ***not*** subject to the Code.  The plain language of § 1.001(a) is consistent with Defendants' characterization.  Defendants also argue § 1.001(a) cannot be interpreted to limit the Education Code's applicability only to institutions receiving government funding because there is a more specific provision of the Education Code which specifically mandates institutions like ICRGS are within the Board's regulatory reach—namely, the Higher Education Coordinating Act of 1965, codified as Chapter 61 of the Texas Education Code.  TEX. EDUC. CODE §§ 61.001-.9732.

Chapter 61 creates the Board and vests it with authority; thus, it is the portion of the Education Code directly applicable in this case.[9]  Defendants argue Subchapter G ("subchapter G") of Chapter 61 expressly vests the Board with authority to regulate degrees offered by ICRGS (and all other private post-secondary institutions which are not specifically exempted in subchapter G).  *Id.* §§ 61.301-321. Specifically, subchapter G empowers the Board to regulate the use of "academic terminology" for institutions in Texas, in order "to prevent deception of the public resulting from the conferring and use of fraudulent or substandard college and university degrees."  *See* TEX. EDUC. CODE § 61.301.  To achieve this purpose, subchapter G provides no "person" (defined as an individual, firm, partnership, association, or other private entity or association thereof," *id.* § 61.302(6)) may grant or award a degree

---

[9]Chapter 61 established the Texas Higher Education Coordinating Board as an agency of the state. TEX. EDUC. CODE § 61.021(a).  "[The Board] provide[s] leadership and coordination for the Texas higher education system, institutions, and governing boards, to the end that the State of Texas may achieve excellence for college education of its youth through the efficient and effective utilization and concentration of all available resources and the elimination of costly duplication in program offerings, faculties, and physical plants."  *Id.* § 61.002(a).  The Board consists "of nine members appointed by the governor so as to provide representation from all areas of the state, and "[m]embers of the board serve staggered six-year terms."  *Id.* § 61.022(a).

on behalf of a "private postsecondary educational institution"[10] unless the institution has been issued a "certificate of authority" to grant the degree by the Board.[11]   *Id.* § 61.304(a).   The Board is empowered to "to specify and regulate the manner, condition, and language used by an institution...or agents thereof in making known that the...institution holds a certificate of authority and the interpretation of the significance of such certificate." *Id.* § 61.304(c).  In sum, as it was explained by the Texas Supreme Court, "subchapter G...requires that a private post-secondary institution either have Board-approved accreditation or satisfy Board-adopted standards before it can describe itself and its students' attainments with words commonly used for those purposes by such institutions." *HEB Ministries, Inc. v. Texas Higher Educ. Coordinating Bd.*, 235 S.W.3d 627, 636-37 (Tex. 2007) (citations omitted).

Thus, subchapter G, on its face, gives the Board authority to regulate the granting of degrees by ICRGS, which undisputedly fits within the definition of a "private postsecondary educational institution" set forth in subchapter G.  Although § 1.001(a) does state the Education Code as a whole applies to "all educational institutions supported in whole or in part by state tax funds," the provisions of subchapter G are not in conflict with that mandate.  Well-established principles of statutory construction require the Court to presume "the entire statute is intended to be effective"; furthermore,

---

[10]ICRGS does not dispute the fact it is a private postsecondary education institution within the purview subchapter G, which defines a "private postsecondary educational institution" as an educational institution which is not a public institution within the definition of § 61.003, and "is not incorporated under the laws of this state, maintains a place of business in this state, has a representative present in this state, or solicits business in this state" and "furnishes or offers courses of instruction in person, by electronic media, or by correspondence leading to a degree or providing credits alleged to be applicable to a degree." *Id.* § 61.302(2).

[11]Some institutions are exempt from this provision, such as those that are "fully accredited by a recognized accrediting agency." *Id.* § 61.303.  Such institutions are generally issued a "certificate of authorization," rather than a certificate of authority. *Id.* But ICRGS does not present any evidence it is exempt from the requirements of subchapter G, and thus the Court assumes subchapter G applies to ICRGS.

if a general provision conflicts with a more specific provision, "the provisions shall be construed, if possible, so that effect is given to both."  TEX. GOVN'T. CODE §§ 311.021(2), 311.026(a).

Keeping these principles in mind, the Court finds § 1.001(a) does not limit the applicability of the Education Code only to institutions supported by state tax funds.  The Legislature clearly intended to regulate the offering of degrees by private postsecondary educational institutions in enacting subchapter G, and therefore ICRGS is not exempt from the Board's authority under subchapter G. Plaintiff's motion for summary judgment on this issue is accordingly DENIED.

Having addressed this primary issue, the Court will proceed to address each of ICRGS's causes of action in turn, to the extent it is able to understand them.  It appears that although the Court has twice required Plaintiff to re-plead and set forth a short and plain statement of the relief requested, Plaintiff is entirely unable to file a complaint which is not overly verbose, disjointed, incoherent, maundering, and full of irrelevant information.

## II.    Free Exercise, Free Speech, and Equal Protection Claims

First, although it is difficult to follow ICRGS's complaint, it appears ICRGS contends the Board engaged in "viewpoint discrimination" against ICRGS, thereby violating its constitutional rights to free exercise of religion, free speech, and equal protection.  *See* Sec. Am. Compl. at 40.  ICRGS makes an as-applied challenge to the State's regulation of its issuance of degrees—and specifically, to the Board's decision to deny its application under those laws—basing all of its constitutional claims on an identical set of facts.  *See, e.g., id.* at  8-39.

### A.    Free Exercise Claim

The First Amendment's prohibition on the making of a law "prohibiting the free exercise" of religion applies to the states through the Fourteenth Amendment.  *See Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).  The "free exercise of religion means, first and foremost, the right to believe and

profess whatever religious doctrine one desires." *Cornerstone Christian Schs. v. Univ. Interscholastic League*, 563 F.3d 127, 135 (5th Cir. 2009) (quoting *Employ. Div., Dep't of Human Res. of Ore. v. Smith*, 494 U.S. 872, 877 (1990)).  Thus, the First Amendment forbids "all governmental regulation of religious beliefs as such." *Id.*  However, the government does not impermissibly regulate religious belief when it promulgates a "neutral, generally applicable" law or rule which happens to result in an incidental burden on the free exercise of a particular religious practice or belief. *Id.*; *Employment Div.*, 494 U.S. at 879 (holding the Free Exercise Clause "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).").  Thus, a law that is neutral and generally applicable prompts rational basis review, rather than strict scrutiny—it need only be rationally related to a legitimate governmental interest in order to survive a constitutional challenge.  *Id.*

Defendants argue the Board's governing standards (under which it found ICRGS's curriculum lacking) are neutral and generally applicable, and therefore rational basis review applies to ICRGS's free exercise claim.  A law or rule is considered neutral and generally applicable "so long as its object is something other than the infringement or restriction of religious practices."  *Grace United Meth. Church v. City of Cheyenne*, 451 F.3d 643, 649-50 (10th Cir. 2006).  But "if the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993).  It is clear the rules governing the Board in this case are facially neutral, and ICRGS notably does not argue otherwise.  With few exceptions, all post-secondary institutions—whether religious or secular, private or public—are required to submit to the State's standards if they desire to grant college or graduate degrees.  *See* Tex. Educ. Code. §§ 61.0512; 61.304; 61.306; 19 Tex. Admin. Code § 7.1.  The Texas

Supreme Court recently stated with respect to the standards set forth in subchapter G that "to issue

degrees [an institution] must comply with public standards.  There is no disparate treatment of any

category of institutions."  *HEB Minist.*, 235 S.W.3d 627, 684.  Thus, the Texas Supreme Court

concluded the statutory scheme in question "is neutral and generally applicable[.]"  *Id.*  This Court

agrees.

Therefore, the Court finds the Board's decision to deny a certificate of authority to ICRGS is

subject only to rational basis review, as the rules which governed the decision are neutral and generally

applicable.  Having so decided, the Court turns to the question of whether the Board's application of

those rules to ICRGS was "rationally related to a legitimate state interest."  *Employment Div.*, 494 U.S.

at 879; *Cornerstone*, 563 F.3d at 139.

### a. Legitimate State Interest

In requiring private postsecondary institutions to seek certificates of authority in order to offer

a degree, the Legislature made the following determinations about the purpose of so doing:

> It is the policy and purpose of the State of Texas to prevent deception of the public
> resulting from the conferring and use of fraudulent or substandard college and
> university degrees; it is also the purpose of this subchapter to regulate the use of
> academic terminology in naming or otherwise designating educational institutions, the
> advertising, solicitation or representation by educational institutions or their agents,
> and the maintenance and preservation of essential academic records.  Because degrees
> and equivalent indicators of educational attainment are used by employers in judging
> the training of prospective employees, by public and private professional groups in
> determining qualifications for admission to and continuance of practice, and by the
> general public in assessing the competence of persons engaged in a wide range of
> activities necessary to the general welfare, regulation by law of the evidences of college
> and university educational attainment is in the public interest. To the same end the
> protection of legitimate institutions and of those holding degrees from them is also in
> the public interest.

TEX. EDUC. CODE § 61.301.  In other words, the Legislature enacted subchapter G in order to (1)

"prevent deception of the public resulting from the conferring and use of fraudulent or substandard

-14-

college and university degrees," (2) assist employers, professional groups, and the public in assessing the competence and academic qualifications of the individuals who have a degree (or other indicators of educational attainment), and (3) protect legitimate institutions and those holding their degrees from the watering-down of their degrees—all purposes which the Legislature specifically found to be "in the public interest." *Id.*

There is no doubt the interests the Legislature sought to protect in enacting subchapter G are legitimate interests of the State. As Chief Justice Marshall held almost two centuries ago, "[t]hat education is an object of national concern, and a proper object of legislation, all admit." *Trustees of Dartmouth College v. Woodward*, 4 Wheat. 518, 634, 4 L.Ed. 629, 658 (1819). The Supreme Court has long held there "can be no doubt as to the power of the State, having high responsibility for education for its citizens, to impose reasonable regulations for the control of" education. *Wisconsin v. Yoder*, 406 U.S. 205, 213 (1972). Likewise, the Texas Supreme Court has recognized "education is perhaps the most important function of state and local governments." *Neeley v. West Orange-Cove Consol. Indep. Sch. Dist.*, 176 S.W.3d 746, 799 (Tex. 2005) (quoting *Brown v. Board of Educ.*, 347 U.S. 483, 493 (1954)). The United States Supreme Court has also held states have a proper interest in the manner in which private schools perform their "secular educational function." *Cent. Dist. No 1 Bd. of Educ. v. Allen*, 392 U.S. 236, 245-47 (1968). Importantly, other state supreme courts have specifically held the granting of academic degrees as evidence of academic achievement is "very intimately related to the public welfare, and is unquestionably subject to regulation by the State." *See, e.g. Shelton College v. State Bd. of Ed.*, 48 N.J. 501, 512 (N.J. 1967). As the Supreme Court of Vermont long ago rationalized:

> To hold that the legislature intended...that any three men in any town in the state, however illiterate or irresponsible, might organize and flood the state with doctors of medicine, doctors of law, doctors of divinity, masters of arts, civil engineers, and the

-15-

other various titles that everywhere in the civilized world have signified high attainments and special equipment for professional work, is to liken it to the witty French minister who threatened to create so many dukes that it would be no honor to be one, and a burning disgrace not to be one.

*Townshend v. Gray*, 19 A. 635, 636 (Vt. 1890).

Based on the foregoing law, the Court finds the State of Texas has a very obvious legitimate interest in protecting the public by ensuring any degree offered in Texas is meaningful and is based upon certain uniform institutional and curricular standards, such that those who rely on the degree may assume the holder has a certain level of academic qualifications and competence in the relevant field.

### b.       Rational relation

The touchstone of rational basis review is whether the government's action is "rationally related to a legitimate state interest." *City of Cleburne*, 473 U.S. at 440. The rational basis test is extremely deferential to the government and the states; it is "not a license for courts to judge the wisdom, fairness, or logic" of government regulation. *FCC v. Beach Comm'ns., Inc.*, 508 U.S. 307, 313 (1993); *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) ("[T]he judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations."). Thus, government regulation is "accorded a strong presumption of validity," *Heller v. Doe*, 509 U.S. 312, 319 (1993), and "the burden is on the one attacking the [regulation] to negative every conceivable basis which might support it." *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973). Government action does not fail rational basis review because it "is not made with mathematical nicety or because in practice it results in some inequality." *Dandridge v. Williams*, 397 U.S. 471, 485 (1970).

Of course, even if the Board's application of its rules to ICRGS in this case was rationally related to legitimate interests of the State of Texas, ICRGS may nevertheless prevail if it demonstrates

the Board's decision was the result of government animus toward religious viewpoints—in other words, if it can show the decision was the product of "invidious viewpoint discrimination."[12] *Lukumi*, 508 U.S. at 547; *Nat'l. Endow. for the Arts v. Finley*, 524 U.S. 569, 587 (1998).  In *Finley*, the Supreme Court emphasized the government may not punish disfavored viewpoints under the guise of legitimate regulation.  *Stearns*, 679 F. Supp. 2d at 587 (citing *Finley*, 524 U.S. at 587)); *and see Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991) ("Regulations which permit the government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment.")).

At issue in this case is the reasonableness of the Board's determination that ICRGS's proposed degree program does not merit a certificate of authority under its governing standards, and specifically Standard 12, and whether the decision was rationally related to the legitimate state interests already identified and not motivated by animus toward a religious viewpoint.  The Board reached its decision based on the recommendation of Commissioner Paredes, who in turn relied upon the staff recommendation and the evaluation done by the review panel of scientists and science educators.

First, the review panel reviewed all the information submitted by ICRGS, both in its application and after it had an opportunity to respond to the panel's concerns.  After reviewing the totality of the information, the panel uniformly recommended ICRGS be denied a certificate of authority to offer its proposed program as a Master of Science in Science Education degree.  For instance, Dr. Patterson, one of the review panel members, stated he found "the course descriptions indicated a very narrow and over-simplified approach to understanding or teaching modern science."

---

[12]As the Court noted in *Association of Christian Schools Intern. v. Stearns*, this principle is not accepted by all members of the Supreme Court, but has been condoned by the majority.  679 F. Supp. 2d 1083, 1102 n.21 (C.D. Cal. 2008) (citing *Lukumi,* 508 U.S. 520, 558 (Scalia, J., concurring) ("[The First Amendment] does not put us in the business of invalidating laws by reason of the evil motives of their authors.") and *id.* at 547 (Kennedy, J.) ("Legislators may not devise mechanisms, overt or disguised, designed to persecute or oppress a religion or its practices.")).

Patterson Decl. at ¶¶ 10-11.  Dr. Patterson noted the textbooks specified in several of the program course descriptions were introductory texts typical for freshman-level undergraduate classes.  *Id.* at ¶ 10.  Dr. Patterson states in his declaration, "[t]he rigor of the proposed course work appeared to be remarkably low, certainly not what we would expect of graduate-level courses."  *Id.*  He also concluded the overall curriculum of the program indicated a "strikingly deficient and incorrect understanding of modern science, its methods, procedures, ways of knowing, and generally-accepted conclusions."  *Id.* at ¶ 11.  He found many of the course descriptions reflected an intent to indoctrinate students in a particular religious-based mode of thought and set of conclusions, "rather than preparing them to instruct students in modern science."  *Id.*

Another panel member, Dr. Gerald Skoog, produced a lengthy written report for the Board.  Skoog Aff, Ex. 2.  In the report, he detailed the reasons why ICRGS's curriculum did not, in his view, meet the requirements of the Board's standards.  *Id.*  Dr. Skoog found ICRGS's stated purpose of teaching students to be leaders in science education could not be met by the program because ICRGS rejects (as is evidenced by its courses, course content, and mission statement) "the underlying principle that science works by providing 'explanation through natural law.'"  *Id.*  He discussed details of the proposed program and course work at length, and concluded the program "ignores established scientific evidence," and "integrates selective scientific data that gives credence to [the framework of Biblical creationism], but ignores, or circumvents, a large body of scientific data that erodes and shatters the foundation of this framework."  *Id.*  He stated the courses listed for the program "are not comparable either in their design or emphasis with existing graduate courses...and the breadth of knowledge that characterizes the biological and geosciences was not reflected in the individual science courses conceptualized for this program."  *Id.*  Dr. Skoog determined the program had limited or no potential to increase the readiness of students enrolled in the program to pursue science-related careers,

and recommended ICRGS's application therefore be denied. *Id.* The rest of the panel agreed with his

recommendation. *See* Def.'s Mot. Summ. J., Exs. 10, 11, 14, 15.

Another reviewer, Dr. David Hillis, agreed Dr. Skoog's report was "thorough and accurate,"

and added to its conclusions the following:

> [T]he evidence in this application clearly indicates this proposed program is not about science education. Science education emphasizes that science is learning about the unknown from a neutral perspective, relying on observable evidence and experimentation. In contrast, this program is about religion, not science[.]... The [ICRGS] program clearly does not meet the standards of the [Board]. In particular the proposed course of study in no way "adequately cover[s] the breadth of knowledge of the discipline taught." The vast majority of the proposed science courses do not resemble any offered for graduate credit by other Texas colleges and universities in breadth, depth, or content, and they would not be acceptable for transfer or credit as a result. The proposed program of study in no way would adequately prepare students in the field of science education, at any level, and certainly not at the graduate level.

*Id.*, Ex. 11.

Dr. Joe Stafford subsequently presented a negative recommendation to the Commissioner in

a staff memorandum dated April 18, 2008. *See* Def.'s Mot. Summ. J., Ex. 6 (Stafford Rep.). Dr.

Stafford noted that to meet the requirements of Standard 12, the "quality, content, and sequence" of

a proposed curriculum must be "appropriate to the purpose of the institution," and must be "such that

the institution may reasonably and adequately achieve the stated objectives" of the program.[13] *Id.* at

---

[13]Standard 12 reads in relevant part:

(A) The quality, content, and sequence of each course, curriculum, or program of instruction, training, or study shall be appropriate to the purpose of the institution and shall be such that the institution may reasonably and adequately achieve the stated objectives of the course or program. Each program shall adequately cover the breadth of knowledge of the discipline taught and coursework must build on the knowledge of previous courses to increase the rigor of instruction and the learning of students in the discipline....

(D) The degree level, degree designation, and the designation of the major course of study shall be appropriate to the curriculum offered and shall be accurately listed on the student's diploma and transcript.

19 Tex. Admin. Code § 7.14(14).

-19-

4.  Furthermore, the program must "adequately cover the breadth of knowledge of the discipline

taught"—in this case, science and science education." Dr. Stafford quoted the following excerpts from

ICRGS's program catalog:

> 1.    "It is the position of the institute that...all **genuine** facts of science support the Bible."
>
> 2.    "The phenomenon of biological life did not develop by natural processes from inanimate systems but was specially and **supernaturally** created by the creator."
>
> 3.    "All things in the universe were created and made by God in the six literal days of the Creation Week described in Genesis...[.]  The creation record is factual, historical, and perspicuous; thus **all theories of origin and development that involve evolution in any form are false**.

*Id.* at 5 (emphasis added by Stafford).  Dr. Stafford concluded these statements (and others) constituted

a rejection of the fundamental principles which guide what scientists do, because scientists must

"remain open to all facts and all observations of natural phenomena in order to refine and improve their

comprehensive explanations of how natural processes appear to work."  *Id.* at 5.  "Scientists seek to

understand how the world works naturally...[and] do not rely on supernatural interventions to explain

the observations found in nature[.]"  *Id.*  Thus, he concluded the guiding principles of ICRGS are in

"direct conflict" with the principles that guide what scientists do, and as a result ICRGS cannot

accomplish its stated objective of preparing students "for leadership in science education."[14]

Dr. Stafford also noted Standard 12 requires the degree level and designation of a proposed

program must be "appropriate to the curriculum offered."  *Id.*  Dr. Stafford noted ICRGS's proposed

degree was a Master of Science in Science Education, but the review panel had found many of the

proposed textbooks were more commonly used in undergraduate classes, and many of the course

objectives were course objectives for undergraduate science courses.  Dr. Stafford found the degree

_____

[14]ICRGS's stated purpose in offering its proposed program is two-fold: to teach students to (1) understand the universe within through biblical perspective, and (2) be leaders in science education."  *Id.* at 6.

designation "Master of Science" to be inappropriate because the program's "[s]cience coverage is narrow and focused on the specific issues of expressed concern to [ICRGS]...[and] students do not cover any field of science with breadth at the graduate level." *Id.* For example, he noted the program includes courses with objectives such as "Interpret paleoclimate descriptions in accordance with a young-earth age model," or "Evaluate flaws in the theory of biological evolution." *Id.* at 6. Dr. Stafford noted the review panel had concluded the curriculum was not in alignment with other curricula for designated master's level science education programs. *Id.* Dr. Stafford concluded his report by stating "[t]o designate this curriculum as a Master of Science in Science Education would be misleading to the public." *Id.*

Based on the review panel's evaluation, the staff recommendation, and his own inquiry, Commissioner Paredes recommended in writing on April 23, 2008 that the Board deny ICRGS's application. He set forth two main reasons for this negative recommendation. First, he found the ICRGS program was inconsistent with the standards or conventions of science and science education. *Id.* He noted ICRGS requires faculty to be committed to "young earth creation science and the Bible," the mission of ICRGS is to "study, teach and communicate the works of God's creation," and the ICRGS catalog sets forth among its basic principles that "the phenomenon of biological life did not develop by natural processes from inanimate systems but was specially and supernaturally created by the creator." *Id.* He stated these beliefs "run counter to the conventions of science, which hold that claims of supernatural intervention are not testable and, therefore, outside the realm of science." *Id.* He found at least one of the texts which was to be used in the program set forth the principle that the earth is young, stating "this is not a working hypothesis to be tested as to whether it is true or false[, but] a basic conclusion drawn from the biblical record of creation as written by the only One who was present, God himself." *Id.* Commissioner Paredes stated, "[w]hatever the ultimate merit of such

-21-

views, they clearly stand at odds with the most basic tenants of scientific work such as observation, testing and analysis."  *Id.*

Secondly, Commissioner Paredes found the ICRGS program was inconsistent with Standard 12, which requires proposed programs "shall adequately cover the breadth of knowledge of the discipline taught," and that "degree level, degree designation, and the designation of the major course of study shall be appropriate to the curriculum offered[.]"  19 TEX. ADMIN. CODE § 7.4(14).  He stated he agreed with the review panel that the proposed program—because it insists on a literal interpretation of biblical creation—gives insufficient coverage to conventional science and does not adequately prepare students in the field of science education.  Commissioner Paredes concluded:

> The key point here is this: the proposed Master of Science in Science Education program inadequately covers key areas of science and their methodologies and rejects one of the foundational theories of modern science; hence, the program cannot be properly designated as either 'science' or 'science education.'

Def.'s Mot. Summ. J., Ex. 7.  He stated he did not intend to question the validity of any set of religious beliefs, and that science and religious belief are surely reconcilable; however, "they are not the same thing."  *Id.*

Based on all the foregoing, it is clear the Board had at least one reasonable rationale for its decision to deny ICRGS's application; namely, that the proposed degree program does not adequately cover the breadth of knowledge of the discipline taught under Standard 12.  Specifically, Commissioner Paredes found the program "inadequately covers key areas of science and their methodologies and rejects one of the foundational theories of modern science," and thus "cannot be properly designated as either 'science' or 'science education.'"  The review panel of scientists and science educators who reviewed ICRGS's curriculum, proposed courses, proposed textbooks, and other materials were unanimous in proclaiming the program would not adequately prepare students

-22-

in the field of science education.  Dr. Stafford agreed with their assessment, as did Commissioner Paredes.  Based on the evidence detailed above, Defendants reasonably could have concluded the proposed program did not adequately prepare students in the field of science education, and could not properly be designated as such a degree.  This decision is rationally related to the State's legitimate interest in protecting the public by preserving the integrity of educational degrees.  ICRGS presents no specific evidence indicating the conclusion reached by the Board was somehow flawed or unreasonable.  Because Defendants have presented one clearly reasonable rationale for their decision to deny the certificate of authority, the Court need not address any other reasons in support of the decision.[15]  *Preminger v. Principi*, 422 F.3d 815, 825 (9th Cir. 2005).

Of course, Defendants may still fail rational basis review if ICRGS is able to show Defendants rejected ICRGS's proposed program in order to punish its religious viewpoint, rather than out of rational concern about the academic merit of the program.  *See Lukumi*, 508 U.S. at 547.  However, ICRGS has set forth no actual evidence of any animus toward it because of its religious viewpoint by any Defendant (although ICRGS's filings contain no shortage of speculation on this subject).  For instance, there is no indication the Board routinely refuses to grant religious institutions approval to offer science or science education degrees, or any other degree, as long as their programs meet the standards set by the Board for curriculum and in other areas.  Nor has ICRGS submitted any evidence the Board drafted its standards to target institutions offering science-related degrees with creationist viewpoints; in fact, the standards are perfectly neutral.  There is also no evidence Commissioner Paredes or any of Defendants who voted to deny did so with any sort of religious motivation; in fact,

---

[15]The Court notes for the record it enters no opinion here on whether it agrees with the Board's decision.  It does not " judge the wisdom, fairness, or logic" of the Board's decision, because it has no jurisdiction to do so.  *FCC*, 508 U.S. at 313. The Court simply comes to the conclusion, which is inescapable, that the decision was rationally related to a legitimate state interest.

Commissioner Paredes specifically stated in his recommendation he did not intend to question the validity of any set of religious beliefs, and that science and religious belief are surely reconcilable, although "they are not the same thing," and should not be taught as such. *Id.* Simply put, ICRGS has presented no concrete evidence of animus toward any religious viewpoint by any of Defendants; thus, ICRGS has not shown the Board's actions were taken for any reason other than furthering the State's compelling interest in protecting the public by preserving the integrity of educational degrees.[16]

For the reasons stated above, the Court finds the Board's decision was rationally related to a legitimate governmental interest, and there is no evidence the decision was motivated by animus toward any religious viewpoint. Therefore, ICRGS's free exercise claim fails as a matter of law, and summary judgment is proper for Defendants on this claim.[17]

### B.     Free Speech Claim

---

[16]ICRGS does offer various emails sent by members of the review panel, which it claims exhibit discriminatory bias. Pl.'s Resp. [#59], Ex. 3; Pl.'s Reply [#61] at ¶ 5. But the emails in question were sent by members of the initial review panel—specifically, Daniel Foster and Andrew Ellington—and one scientist who was invited to join the review panel but did not (Robert Curl). None of the emails were written by members of the review panel whose report and opinions Dr. Stafford and the Commissioner relied upon. Thus, their views are irrelevant. Furthermore, the emails reveal no sinister motives on the part of the writers: at the most, they reveal they had written Commissioner Paredes opposing the grant of a certificate of authority to ICRGS before they were formally asked to be part of the review panel. But this is not evidence of discriminatory intent in and of itself; it is only evidence they had opinions on the subject of whether the curriculum of the proposed program was fitting, which is unremarkable given they were experts in the field.

[17]ICRGS also brings a claim under Texas Civil Practices and Remedies Code § 106.001, which prohibits officers of the state from refusing to issue a certificate, grant participation in a state-operated program, or grant a benefit to a person because of their religion. *See* Sec. Am. Compl. at ¶ 41(f) (citing Tex. Civ. Prac. & Rem. Code § 106.001). But because, as stated *supra*, the Court finds ICRGS has submitted no evidence raising a genuine issue of fact as to whether the Board's decision to deny its application was motivated by animus or discriminatory intent toward ICRGS's religious viewpoint, this claim necessarily fails.

Likewise, ICRGS brings a free exercise claim under article I, § 6 of the Texas Constitution, which states "no preference shall ever be given by law to any religious society." The parties do not argue there is any difference in the federal and state constitutional provisions; thus, summary judgment is also appropriate on Plaintiff's free exercise claim under the Texas Constitution. *See Tilton v. Marshall*, 925 S.W.2d 672, 677 n. 6 (Tex. 1996) ("Because Tilton has not argued persuasively for a different application of the provisions of the First Amendment and Article I, Section 6 as they pertain to the free exercise of religion, we assume without deciding that the state and federal free exercise guarantees are coextensive with respect to his particular claims.").

ICRGS also argues the Board's decision to refuse it a certificate of authority to offer its Master of Science Education program in Texas violated its freedom of speech.[18]  This claim is based on the exact same facts as the free exercise claim considered in the preceding section, and the Board's decision is subject to rational basis review in this context as well.  The Supreme Court has rejected heightened scrutiny where, as here, the government provides a public service that, by its nature, requires evaluations of and distinctions based on the content of speech.  *See United States v. American Library Ass'n, Inc.*, 539 U.S. 194, 203-208 (2003) ("*ALA*"); *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580-87 (1998).[19]  It is hard to imagine a situation which more acutely requires the State to evaluate and make distinctions based on the content of speech than the one presented in this case.  The Board, in order to protect Texas citizens and ensure the reliability of degrees earned within the State's borders, is charged with reviewing the curricula of proposed degrees to be offered by institutions of higher education so that it may determine whether those degrees are substandard or fraudulent.  *See* TEX. EDUC. CODE § 61.301.  By its very nature, this public service requires that the Board evaluate the content of the degree programs to be offered.  Thus, the Board's decision is subject to rational basis review.

As the Court stated above, under rational basis review the burden lies with the challenger "to negative every conceivable [rational] basis which might support" the government's decision.

---

[18]Of course, ICRGS is still perfectly free to offer the program, using any curricula, classes, or textbooks it wishes.  ICRGS has **only** been denied the right to offer its proposed program as a Master of Science in Science Education degree, because the Board has determined it has not met the Board's uniform, state-wide standards for offering such a program.

[19]This case does not involve a forum and neither party argues it is a public forum case, which would render it subject to heightened judicial scrutiny.

*Lehnhausen*, 410 U.S. at 364.  ICRGS does not attempt this feat, and would fail if it tried.  ICRGS's

free speech challenge fails rational basis review for the reasons stated in section (A), *supra*.[20]

### C.        Equal Protection Claim

ICRGS also argues Defendants violated the Equal Protection Clause of the United States

Constitution by discriminating against it on the basis of its religious beliefs.  The Equal Protection

Clause "commands that no State shall 'deny to any person within its jurisdiction the equal protection

of the laws, 'which is essentially a direction that all persons similarly situated should be treated alike.'"

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).   Because the Court has already

determined, *supra*, that the Board's decision was not a violation of ICRGS's fundamental rights to the

free exercise of its religion or to free speech, rational basis scrutiny applies to ICRGS's equal

protection claims.[21]  *Locke v. Davey*, 540 U.S. 712, 721 n.3 (2004); *Johnson v. Robison*, 415 U.S. 361,

375 n. 14 (1974) ("[because] we hold...that the [law] does not violate appellee's right of free exercise

of religion, we have no occasion to apply to the challenged classification a standard of scrutiny stricter

than the traditional rational-basis test."); *Teen Ranch v. Udow*, 389 F. Supp. 2d 827, 841 (W.D. Mich.

2005) ("[because plaintiffs] do not have a meritorious Free Speech or Free Exercise claim, their Equal

Protection claim is subject to rational basis scrutiny.").

---

[20]For the same reasons, Defendants are entitled to summary judgment on ICRGS's claims under the free speech provision of the Texas Constitution.  Although Texas courts have recognized the Texas free speech clause differs textually from its federal counterpart and may offer greater protection in some circumstances, *Alcorn v. Vaksman*, 877 S.W.2d 390, 401-02 (Tex.App.–Houston [1st Dist.] 1994, writ denied), ICRGS has not cited any authority interpreting the Texas free speech clause to provide greater protection to a plaintiff under similar facts and circumstances to those presented in this case.  Accordingly, Defendants are also entitled to summary judgment on ICRGS's free speech claim based on the Texas Constitution.

[21]"Where...the classification created by the regulatory scheme neither trammels fundamental rights...nor burdens an inherently suspect class, equal protection analysis requires only rational basis review." *Cornerstone*, 563 F.3d at 139 (citation omitted).

For all the reasons stated above, the Board's decision to deny ICRGS a certificate of authority passes such review; Defendants are therefore entitled to summary judgment on ICRGS's equal protection claim.[22]

## III.   Due Process Claim

ICRGS also contends it was denied its constitutional right to due process because the Board used arbitrary procedures and unjustly applied its rules in denying it a certificate of authority.  Sec. Am. Compl. at ¶¶ 40(c), 41(d).  It is unclear whether ICRGS intends to assert a procedural or substantive due process claim in its complaint, although in its response to Defendants' motion for summary judgment it claims "both procedural and substantive due process rights are concerned" in this case.  *See* Pl.'s Resp. at ¶ 52.  Thus, the Court will assume ICRGS intends to assert both a procedural and a substantive due process claim.

## A.   Procedural due process

Procedural due process "imposes constraints on governmental decisions that deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment."  *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).  Thus, "[t]o bring a procedural due process claim..., a plaintiff must first identify a protected life, liberty or property interest and then prove that governmental action resulted in a deprivation of that interest."  *Baldwin v. Daniels*, 250 F.3d 943, 946 (5th Cir. 2001).  When a plaintiff is deprived of a protected interest, procedural due process requires "notice and an opportunity to be heard" before a final deprivation of the interest.  *Cleveland Bd. of Educ. v. Loudermille*, 470 U.S. 532, 546 (1985).

---

[22]Defendants are likewise entitled to summary judgment on ICRGS's equal protection challenge under the Texas Constitution, as such challenges are analyzed in the same manner as equal protection claims under the federal Constitution.  *Reid v. Rolling Fork Public Util. Dist.*, 979 F.2d 1084, 1089 (5th Cir. 1992); *Hogan v. Hallman*, 889 S.W.2d 332, 338 (Tex. App.–Houston [14th Dist.] 1994, writ denied).

ICRGS's procedural due process claim hinges on whether it can show (1) it has a protected property interest in offering its program as a Master of Science in Science Education, and (2) governmental action resulted in a deprivation of that interest.[23]  The Supreme Court has made clear "the property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money." *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 769 (2005). In fact, "property interest" denotes a "broad range of interests that are secured by existing rules or understandings." *Id.* (quoting *Perry v. Sindermann*, 408 U.S. 593, 601 (1972)).  A property interest may arise from an expectation or interest created by state laws or policies, *see, e.g. Wolff v. McDonnell*, 418 U.S. 539, 556-558 (1974); thus, the Supreme Court has found protected "property" interests in the retention of a number of state-conferred benefits and services, including welfare benefits, disability benefits, public education, utility services, government employment, and in other entitlements that defy easy categorization.  *Id.* (citing cases).  But the common ground among these cases is that "due process only becomes relevant where such property is 'deprived' e. g., where welfare benefits are terminated...; where public employees are discharged...; or where licenses are revoked[.]" *Wells Fargo Arm. Servs. Corp. v. Georgia Public Serv. Comm'n.*, 547 F.2d 938, 941 (1977).

In this case, it is undisputed ICRGS never had a certificate of authority to offer its Master of Science in Science Education degree in Texas; thus, no entitlement to such a certificate could possibly

---

[23]ICRGS also asserts it may have a protected liberty interest at stake, but notably cites no legal support for this claim.  A liberty interest is generally created in one of two ways: either the Due Process Clause confers the liberty interest, *Sandin v. Conner*, 515 U.S. 472, 479 n. 4 (1995), or the interest is created by the state through a statute.  *Id.* at 477-78.  The Supreme Court has stated the "liberty"specially protected by the Due Process Clause includes the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion, among other things.  *See Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (collecting cases).  ICRGS cites no authority to support the absurd proposition the Due Process Clause protects, as a fundamental liberty interest, the right to offer an academic degree.  Nor does ICRGS argue any state statute confers this as a fundamental right.  Therefore, the Court finds ICRGS does not have a protected liberty interest in offering its degree unimpeded by state regulation, and continues its analysis.

-28-

have been created by the State or its laws.  ICRGS has not cited any law that supports the proposition it has a protected property interest in the certificate of authority—which it has **never** acutally possessed—and the Court can find none.  Therefore, because it has identified no protected interest, summary judgment against ICRGS is appropriate on ICRGS's procedural due process claim.[24]

### B.        Substantive due process

In what appears to be an attempt to raise a substantive due process claim, ICRGS also asserts the Board "us[ed] arbitrary norms and procedures to deny ICRGS a license to which it was duly entitled."  Sec. Am. Compl. at ¶ 40(c).  However, "[t]o establish a substantive due process violation, a plaintiff must first both carefully describe that right and establish it as 'deeply rooted in this Nation's history and tradition.'"  *Cantu-Delgadillo v. Holder*, 584 F.3d 682, 687 (5th Cir. 2009).  If the right is so deeply rooted as to be considered fundamental, the court "will subject it to more exacting standards of review"; if it is not, it is subject only to rational basis review.  *Id.*

In this case, ICRGS has not attempted to establish it has a fundamental right to offer its degree using the terminology it wishes, and the Court finds no basis in jurisprudence to conclude it does. Therefore, the Board's decision is subject to rational basis review, which is satisfied if the state action "is supportable by some legitimate goal and...the means chosen for its achievement [is] rational." *Martin v. Mem'l. Hosp.*, 130 F.3d 1143, 1149-59 (5th Cir. 1997).  The Court has already determined the Board's decision was rationally related to the state's legitimate interest in protecting the public by

---

[24]Although it is not necessary to reach this issue, the Court also notes there is absolutely no support for the proposition ICRGS did not receive "notice" or "an opportunity to be heard" with respect to the Board's decision not to grant its application.  *See Loudermille*, 470 U.S. at 546.  In fact, the record shows it clearly received both.

preserving the integrity of educational degrees, and therefore summary judgment is appropriate on ICRGS's substantive due process claim.[25]

## IV.    TRFRA Claim

ICRGS also claims Defendants' actions, including their "failure to accommodate ICRGS's religious viewpoint," violated the Texas Religious Freedom Restoration Act ("TRFRA").  Sec. Am. Compl. at ¶ 41(e).  TRFRA provides, in part, that "a government agency may not substantially burden a person's free exercise of religion" unless the government agency demonstrates that the application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that interest.  TEX. CIV. PRAC. & REM. CODE § 100.003.  Under TRFRA, the plaintiff bears the initial burden of showing the government is substantially burdening his or her free exercise of religion; if the plaintiff carries this burden, the government must then demonstrate the burden is imposed in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest.  *Balawajder v. Tex. Dep't of Crim. Justice*, 217 S.W.3d 20, 26 (Tex.App.–Houston [1st Dist.] 2006, pet. denied).

### A.    Substantial burden on free exercise of religion

ICRGS has not carried its burden of raising a genuine issue of material fact as to whether Defendants have substantially burdened its religious beliefs.  Notably, TRFRA defines "free exercise of religion" as "an act or refusal to act that is substantially motivated by sincere religious belief."  TEX. CIV. PRAC. & REM. CODE § 110.001(a)(1).  There is no bright-line rule for determining whether one's free exercise of religion has been "substantially burdened" under TRFRA.  *Barr v. City of Sinton*, 295

---

[25]ICRGS also brings a claim under the "due course of law" provision of the Texas Constitution.  *See* Sec. Am. Compl. at ¶ 41(d).  The Texas Supreme Court has held the Texas Constitution's due course of law provision, article I § 19, protects essentially the same interests as the Due Process Clause of the United States Constitution.  *NCAA v. Yeo*, 171 S.W.3d 863, 867-68 & n. 14 (Tex. 2005).  Therefore, summary judgment is also proper on ICRGS's claim under the Texas Constitution's due course of law clause.

S.W.3d 297, 301-302 (Tex. June 19, 2009).  However the Texas Supreme Court recently noted with approval the Fifth Circuit's holding that, under RLUIPA, "a government action or regulation creates a 'substantial burden' on a religious exercise if it truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs."[26]  *Id.* (citing *Adkins v. Kaspar*, 393 F.3d 559, 570 (5th Cir. 2004)).  "The burden must be measured, of course, from the person's perspective, not the government's."  *Id.* at 301.  TRFRA "requires a case-by-case, fact-specific inquiry" into whether a substantial burden has been imposed on one's free exercise of religion.  *Id.* at 302.

In this case, ICRGS has failed to carry its burden to show the Board's denial imposed a substantial burden on its free exercise of religion.  First, ICRGS has not presented any evidence indicating it is substantially motivated by sincere religious belief in offering the Master of Science in Science Education degree.  To prove a substantial burden, it is essential the plaintiff present evidence of his or her particular religious beliefs regarding the complained-of governmental conduct.  *Sanchez v. Saghian*, 2009 WL 3248266 at *9-10 (Tex.App.–Houston [1st Dist.] 2009).  "TRFRA's required balancing of individual religious freedoms against unwarranted governmental intrusion is too important to be done based upon conjecture and surmise about critical facts such as [the plaintiff's religious beliefs relating to the challenged governmental action]."  Because ICRGS alternates between arguing it is merely teaching science and arguing its program is compelled by its religious beliefs, the Court is at a loss to determine what portion of ICRGS's behavior should be considered motivated by its religious beliefs.  And although its pleadings and various documents in the record (such as the report

---

[26]The federal counterpart to TRFRA is the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). *Adkins v. Kaspar*, 393 F.3d 559, 567 & n. 32 (5th Cir. 2004).  "Because TRFRA, RFRA, and RLUIPA were all enacted in response to *Smith* and were animated in their common history, language and purpose by the same spirit of religious freedom," decisions applying the federal RFRA and RLUIPA statutes are considered germane in applying the Texas statute.  *Barr v. City of Sinton*, 2009 WL 1712798 at *5 (Tex. June 19, 2009).

of the review panel) contain third-person references to ICRGS's religious beliefs, the Court has no actual evidence (such as an affidavit) of what those beliefs are and to what extent they motivate ICRGS in offering the degree in question.[27]  Without any evidence of ICRGS's specific religious beliefs and what it considers its religiously-motivated behavior, the Court is entirely unable to conduct an inquiry into whether the government action has created a substantial burden on ICRGS's free exercise by "truly pressur[ing] [ICRGS] to significantly modify [it]s religious behavior and significantly violate [it]s religious beliefs."  *Barr*, 295 S.W.3d at 301-02.

Further, even assuming ICRGS's offering of its Master of Science in Science Education program is substantially motivated by its sincere religious beliefs, ICRGS has also failed to show the burden (if any) imposed by Defendants on those beliefs is "real" and "significant."  *Merced v. Kasson*, 577 F.3d 578, 588 (5th Cir. 2009).  For instance, ICRGS has not shown it is without alternatives to offering a Master of Science in Science Education degree, or that its alternatives are severely limited.  *Id.*  In fact,  ICRGS's alternatives are countless—it is undisputed there is nothing at all preventing ICRGS from teaching any of its viewpoints, or from operating as an educational institution in Texas. The Board has not banned ICRGS from teaching its proposed program or any other—far from it.  The Board has simply declined to certify ICRGS's program as a Master of Science in Science Education. ICRGS might well apply for a certificate of authority to offer the same program as, for instance, a Master of Arts program in Creation Studies.  Or it might decide to offer a religious degree; in that case, it would be exempt from the requirement to obtain a certificate of authority to offer the degree in Texas.  19 TEX. ADMIN. CODE § 7.9 ("The...Board does not regulate Religious Institutions of Higher

---

[27]The Fifth Circuit has made clear "unsubstantiated assertions are not competent summary judgment evidence... In response to motions for summary judgment, it is incumbent upon the non-moving party to present evidence—not just conjecture and speculation—to support each element of the claim."  *Lewallen v. ConMed Corp.*, 261 Fed. App'x. 704, 706 (5th Cir. 2008).

Education which offer degrees only in religious disciplines."). In either case, ICRGS would not be prevented from offering the proposed degree program; it is only prevented from holding it out as a Master of Science degree with a major in Science Education. Because there are numerous alternatives for ICRGS to offer its creationist message in an educational setting, the Court finds the Board's decision is not a government action which "truly pressures" ICRGS to "significantly modify [its] religious behavior and significantly violate [its] religious beliefs." *See Adkins*, 393 F.3d at 569. Thus, because ICRGS has not alleged a substantial burden, judgment is proper for Defendants as a matter of law on ICRGS's TRFRA claim.

### B.     Compelling government interest and least restrictive means

TRFRA places on Defendants the burden of proving the burden imposed on ICRGS both advances a compelling interest and is the least restrictive means of doing so. TEX. CIV. PRAC. & REM. CODE § 110.003(b). In this case, Defendants assert its decision advances the State's compelling interest in "educating its citizens and preserving the integrity of degrees offered at institutions of higher education," and—specifically with respect to ICRGS—ensuring ICRGS does not offer a degree which is misleading to the public or would confuse prospective students into believing they would have proficiency in science and science education upon graduating, when in reality they would not. Def.'s Mot. Summ. J. at 24. It also claims its action was the least restrictive means of advancing those interests. *Id.*

But these issues are irrelevant; because ICRGS has not raised a genuine issue of material fact as to whether the Board imposed a substantial burden on its religious exercise, the presence or absence of a compelling governmental interest is immaterial. *See, e.g. Petra Presbyterian Church v. Village of Northbrook*, 489 F.3d 846, 852 (7th Cir. 2007) (finding "the absence of a compelling governmental interest is not relevant to a RLUIPA claim unless the challenged restriction on the use of property

imposes a substantial burden on the religious organization."); s*ee e.g., Adkins*, 393 F.3d 559.[28] Because the Court has found ICRGS failed to allege a substantial burden on its religious exercise as a matter of law, Defendants are entitled to summary judgment on the TRFRA claim without further discussion.

**V.     Standard 12**

Finally, ICRGS seeks to invalidate Standard 12 (and thereby the Board's decision) on the ground it is "too vague and/or arbitrary as a 'gatekeeping' standard that criminalizes free speech." Pl.'s Mot. Summ. J. at ¶ 5.  Specifically, ICRGS claims the phrase "appropriate to the purpose of the institution" in Standard 12, *see* TEX. ADMIN. CODE § 7.4(14)(A), is not a valid standard for the Board to use in reviewing curricula.  *Id.*  ICRGS claims the vagueness of Standard 12 is proven by the fact the initial site visit team gave a positive evaluation of ICRGS's curriculum under Standard 12, whereas the subsequent review panel gave a negative evaluation of the curriculum.  *Id.* at ¶ 10.  ICRGS cites no legal support for its argument whatsoever, but instead relies on rambling, repetitive assertions and a hodgepodge of legal terminology, most of which are irrelevant to its argument.  Thus, before evaluating ICRGS's vagueness claim, the Court is faced with the exasperating task of determining exactly what the claim is.

It is clear ICRGS seeks to challenge what it believes are the vague standards set forth in Standard 12, and specifically subsections (A) and (D).[29]  But Defendants claim ICRGS is precluded

---

[28]Although the cited cases discuss RLUIPA, RLUIPA is the federal counterpart to TRFRA, and therefore decisions applying RLUIPA are germane to a TRFRA analysis.  *See Barr*, 295 S.W.3d at 296.

[29]Subsections (A) and (D) of Standard 12 read, as stated above:

(A) The quality, content, and sequence of each course, curriculum, or program of instruction, training, or study shall be appropriate to the purpose of the institution and shall be such that the institution may reasonably and adequately achieve the stated objectives of the course or program. Each program shall adequately cover the breadth of knowledge of the discipline taught and coursework must build on the

-34-

from bringing an as-applied challenge because no criminal penalties have ever been imposed on ICRGS under the Board's governing regulations.  ICRGS claims Standard 12 "criminalizes free speech." *see* Pl.'s Mot. Summ. J. at ¶ 5.  The statement is misleading.  The governing regulations do in fact have a criminal component: Rule 7.5(a)(1) provides, in relevant part, that no person or institution may offer a degree on behalf of a nonexempt institution unless the institution has a certificate of authority to offer the degree.  19 TEX. ADMIN. CODE § 7.5(a)(1).  Rule 7.5(c) warns a violation of the rule may constitute a violation of Texas Penal Code § 32.52 or Texas Education Code §§ 61.312 and 61.313, and an offense under subsection (a)(1) may be a Class A misdemeanor.  *Id.* § 7.5(c).  However, ICRGS has undisputedly never violated Rule 7.5 by attempting to offer a degree for which it has no certificate of authority, nor has it been subject to any kind of penalty under the subsection.  Neither does ICRGS argue the provisions of Rule 7.5(a)(1) are vague or arbitrary.  In other words, Rule 7.5 is irrelevant to this lawsuit.

What is relevant to the lawsuit is Standard 12, which ICRGS claims is unconstitutionally vague.  Standard 12 ***was*** applied to ICRGS—in fact, the failure of ICRGS's proposed program to meet the requirements of Standard 12 was the sole justification the Board offered for ICRGS not receiving a certificate of authority to offer the program.  Thus, the Court finds the only sensible way to interpret ICRGS's assertions are as a void-for-vagueness challenge to Standard 12 as it was applied to ICRGS.

---

knowledge of previous courses to increase the rigor of instruction and the learning of students in the discipline....

(D) The degree level, degree designation, and the designation of the major course of study shall be appropriate to the curriculum offered and shall be accurately listed on the student's diploma and transcript.

19 TEX. ADMIN. CODE § 7.14(14).

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "A statute is unconstitutionally vague if it does not give 'a person of ordinary intelligence a reasonable opportunity to know what is prohibited.'" *Cortes v. City of Houston*, 536 F. Supp. 2d 783, 795 (S.D. Tex. 2008) (quoting *Groome Resources, Ltd. v. Parish of Jefferson*, 234 F.3d 192, 217 (5th Cir. 2000)). The void-for-vagueness doctrine has primarily been used to strike down criminal laws. *Id.* It may also be used in the civil context, but in such a case the standard for vagueness is more lenient; "the statute must be so vague and indefinite as really to be no rule at all." *Id.*; *and see Village of Hoffman Estates v. Flipside*, 455 U.S. 489, 498 (1982) (holding "[t]he degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment."). Courts have "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Flipside*, 455 U.S. at 498.

Standard 12 is a civil regulation. Noncompliance with its standards results not in criminal penalties, but merely in the denial of a certificate of authority to offer a degree. Thus, a more lenient standard for vagueness applies to the rule. To be unconstitutionally void for vagueness, as stated above, it "must be so vague and indefinite as really to be no rule at all." *Cortes*, 536 F. Supp. 2d at 795. In determining whether a statute is unconstitutionally vague, courts look, *inter alia*, to whether the statute "provide[s] definite standards for those who apply them." *Beckerman v. Tupelo*, 664 F.2d 502, 511 (5th Cir. 1981). In this case, ICRGS has offered no actual evidence Standard 12 is unconstitutionally vague (though it pontificates extensively on the subject), and the Court can discern nothing in the language of the provision which raises a genuine question of material fact about the constitutionality of its provisions from a vagueness standpoint. Even a casual glance at the standard

shows it sets forth definite standards for the Board to judge a proposed curriculum: it makes clear the curriculum must be "such that the institution may reasonably and adequately achieve the stated objectives of the course or program"; the curriculum must cover the breadth of knowledge of the discipline taught, and "coursework must build on the knowledge of previous courses to increase the rigor of instruction and the learning of students in the discipline." 19 TEX. ADMIN. CODE § 7.4(14). Standard 12 also mandates the degree level and designation must be "appropriate" to the curriculum offered and be "accurately listed" on the student's diploma and transcript. *Id.* Rule 7.4, which contains Standard 12, states "[t]hese standards represent generally accepted administrative and academic practices and principles of accredited postsecondary institutions in Texas. Such practices and principles are generally set forth by institutional and specialized accrediting bodies and the academic and professional organizations." *Id.* § 7.4.

Based on the foregoing, the Court finds the standards for curriculum set forth in Standard 12 are not unreasonably vague or arbitrary. The standard uses words and phrases (such as "reasonable" and "appropriate") with common and well-settled meanings, and is patterned after practices and principles generally set forth by other accrediting bodies and academic and professional organizations. *Id.* The rule is comprehensible, and gives institutions fair notice of the standards which will be used to judge a proposed curriculum. Although the standard is not specific to a science curriculum, some generalizations in legislation are always necessary—it would be duplicative and practically impossible for the Board to articulate separate standards on every single academic subject which might be taught in institutions of higher education in Texas. The Texas Supreme Court, discussing all of the Board's standards, including Standard 12, described them as "lengthy, detailed, rigorous, and comprehensive, covering every aspect of an institution's operation." *H.E.B. Ministries, Inc.*, 235 S.W.3d at 633. The

Court specifically quoted the first sentence of Standard 12(A) as an example of a standard that is "quite explicit." *Id.*

The mere fact the conclusions of the initial site visit team and the later review panel differed is, in and of itself, not determinative of vagueness (although ICRGS makes much of it). Neither the site visit team nor the review panel had the authority to finally approve or disapprove the curriculum under Standard 12—both were simply making recommendations to the Board. The most obvious explanation for the fact they reached different conclusions is the relative thoroughness of their evaluations (the latter being far more thorough) and the relative experience with comparable curricula of those conducting the evaluation (the latter being composed entirely of scientists and science educators). There was absolutely no indication from any member of the site team or the review panel that the applicable standards for judging the curriculum were confusing or vague. Likewise, ICRGS participated fully in the review process—by preparing an extensive application, hosting the site visit, responding to the review panel's concerns and submitting additional information about its curriculum, and presenting its case to the Board—but it is undisputed ICRGS never, during the entire process, indicated any confusion on the meaning of the applicable standards or how to show compliance with those standards. In sum, there is simply no credible argument Standard 12 is "so vague and indefinite as really to be no rule at all," and thus the Court finds ICRGS's motion for summary judgment on the issue of vagueness should be DENIED.

## Conclusion

In conclusion, the Court finds ICRGS has not put forth evidence sufficient to raise a genuine issue of material fact with respect to any claim it brings. Thus, Defendants are entitled to summary judgment on the totality of ICRGS's claims against them in this lawsuit.

-38-

Therefore, in accordance with the foregoing,

IT IS ORDERED that Plaintiff the Institute for Creation Research Graduate School's Final Motion for Summary Judgment [#53] is DENIED in full.

IT IS FURTHER ORDERED that Defendants the Texas Higher Education Coordinating Board, Commissioner Raymund Paredes, Lyn Bracewell Phillips, Joe Hinton, Elaine Mendoza, Laurie Bricker, A.W. Riter, III, Brenda Pejobich, and Robert Shepard's Motion for Summary Judgment [#54] is GRANTED in full.

IT IS FURTHER ORDERED that ICRGS's Motion to Strike [#34], because it sets forth ICRGS's objections to Defendants' expert witnesses which would only be relevant in the event of a trial, is DISMISSED as moot.

IT IS FINALLY ORDERED that ICRGS's Unopposed Motion for Scheduling Relief [#51, which would also only be relevant in the event of a trial, is DISMISSED as moot.

SIGNED this the 18th day of June 2010.

_____

SAM SPARKS

UNITED STATES DISTRICT JUDGE